Docket #
25-cv-6272

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Andrews Oduro Brown

                    Petitioner,

OF
            v.
PURSUANT

*Pam Bondi*, Attorney General

                    Respondents.

PETITION FOR WRIT

HABEAS CORPUS

TO 28 U.S.C. §2241

  Civ. No.:

---

        Petitioner, Andrews Oduro Brown, hereby petitions this
Court for a writ of habeas corpus to remedy his unlawful
detention, and to enjoin his continued unlawful detention by
the Respondents. In support of this petition and complaint
for injunctive relief, Petitioner alleges as follows:

                            PARTIES

        1.) Petitioner Andrews Oduro Brown  native and citizen
of Ghana. He was ordered deported on October 01,2024. On
December 18th, 2024 Petitioner's order became final.He has
been detained by the Bureau of Immigration and Customs
Enforcement (ICE) for over 13 months.

        2.) Respondent *Pam Bondi* is the Attorney General of the
United States and is responsible for the administration of
ICE and the implementation and enforcement of the
Immigration laws. As such, she is the ultimate legal

1

custodian of the Petitioner.

    3.)    Field Office Director  S. Kurzdorfer for
Detention and
Removal, Buffalo Field Office, Bureau of Immigration and
Customs

Enforcement, Department of Homeland Security. As such, he is
the local ICE official who has immediate custody of the
Petitioner.

    4.) Department of Homeland Security is the agency
charged with implementing and enforcing the immigration
laws.

    5.) Respondent *and* the Facility Director of the Buffalo
Federal Detention Facility in Batavia, New York where
Petitioner is detained and he has immediate custody of the
Petitioner.

CUSTODY

    6.) Petitioner is detained at the Buffalo Federal
Detention Facility at 4250 Federal Drive, Batavia, New York
where immigrant detainees are held. Petitioner is under the
direct control of Respondents and all their agents.

JURISDICTION

    7.) This action arises under the Constitution of the
United States, and the Immigration and Nationality Act

2

(INA), 8 U.S.C. §1101 *et seq.*, as amended by the Illegal

Immigration Reform and Immigrant Responsibility Act of 1996

(IIRIRA), Pub. L. No. 104-208, 110 Stat. 1570, and the

Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*

This Court has jurisdiction under 28 U.S.C. § 2241, Art. I §

9, Cl. 2 of the United States Constitution (Suspension

Clause), and 28 U.S.C. § 1331, as the

petitioner is presently in custody under color of the

authority

of the United States, and such custody is in violation of

the

Constitution, laws, or treaties of the United States. See

Zadvydas v. Davis, 533 U.S. 678, 121 S. Ct. 2491 (2001).

## VENUE

8.) Venue lies in the Western District of New York

because Petitioner is currently detained at the Buffalo

Federal Detention Facility. Venue in the Western District of

New York is also proper because Petitioner is in the custody

of Interim Field Office Director of Buffalo, which

encompasses the area where Petitioner is detained. 28 U.S.C.

§ 1391.

3

## EXHAUSTION OF REMEDIES

9.) Petitioner has exhausted his administrative remedies to the extent required by law, and his only remedy is by way of this judicial action. After the Supreme Court decision in <u>Zadvydas</u>, the Department of Justice issued regulations governing the custody of aliens ordered removed. See 8 C.F.R. §241.4. On April 26,2024 Mr. Brown was taken in to custody . At his "90-day" custody review on  February 13, 2025, ICE decided to continue his detention. In his 180 days review a decision dated on May 13,2025, from ICE's Headquarters Post-Order Detention unit (HQPODU) informed Petitioner that it would continue to keep him in custody. The custody review regulations do not provide for appeal from a HQPODU custody review decision. See 8 C.F.R. § 241.4(d).

10. No statutory exhaustion requirements apply to Petitioner's claim of unlawful detention.

## STATEMENT OF FACTS

*A.    Background*

11.) Petitioner,(Mr. Brown], was born in Ghana on Febuary 11,1983. Mr. Brown's came to the United States on May 05,2013 by crossing the boader. Petitioner lived with

4

his wife, who's a native and citizen of America along with my six american citizen childrens. Petitioner rest of his families thru out America are citizen as well .

12.) On December 18,2014 an immigration judge entered an administrative order to have Petitioner removed from the United States to Ghana.

13.) Petitioner was ordered removed because of his charges on his Notice To Appear identity theft.

14.) Petitioner was released from North West Department of Correctional Services Ohio into ICE custody on April 26,2024 where he is detained at the Seneca County Jail Ohio. He has cooperated fully with all efforts by ICE to expedite his removal from the United States to Ghana. Although Petitioner's
order of removal became final, Petitioner has yet to receive any
travel documents from the Ghana consulate.

15.) Petitioner has been in detention for over 13 months.

After receiving a final removal order ICE has been unable to carry out his removal. Petitioner's consulate has not issued travel documents and there is no certainty as to when, if ever, such papers will be issued. Thus, Petitioner's removal

5

from the United States is not likely to occur within the
reasonable foreseeable future. See Habtegaber v. Jenifer,
256 F. Supp. 2d 692, 697-98 (E. D. Mich. 2003) (Ethiopian
national ordered released after 7 months detention where
neither Ethiopia nor Eritera responded to INS's request for
travel documents); Okwilago v. Immigration & Naturalization
Service, No. 3-01-CV-1416-BD, 2002 WL 356758, *3 (N.D. Tex.
Mar. 1, 2002. The Court explained that the intrest 1226(c)-
detained noncitizen hold is the most significant liberty
interest there is-the interest in being free from
imprisonment. Black, 103 F.4th at 151 (quoting  1226(c)
Velasco Lopez v. Decker, 978 F.3d 842, 851 (2d Cir.2020).
The Court noted that noncitizendetained under 8 U.S.C §
1226(c)possess the same liberty interest as noncitizens
detained under any other statute. see id. And, it
highlighted that 1226(c)- detained noncitizens lack any
administrative mechanisms by which
they could challenge their detention. see id. Here, because
Mr.
Brown has been detained in civil immigration detention since
on
or about April 26,2024, Mr.Brown, too, possesses the same
liberty interest as Black and GM. In Black Court found that
there is a high risk of erroneous deprivation of rights for

6

1226(c)-

detained noncitizens because there are almost nonexistent

procedural protections in place for section 1226(c)

detainees[.] *id. at 152*. The Court observed that while

1226(c)-detained noncitizens possess due process protections

in other adjacent domains-such as the ability to ask for

matter of joseph hearings, which resolve whether they may be

subjected to mandatory detention--those mechanisms are

insufficient in covering over the deficient processes

noncitizens possess for requesting their actual release. see

id. The Court thus concluded that 1226(c)-detained

noncitizen are faced with even higher risk[s] of erroneous

deprivation of their private liberty interests than 1226(a)-

detained noncitizens. *see id*. Here Mr. Brown has not

recieved any mechanism that would ensure an impartial

adudication of his continued detention. Rather, the only

review of Mr. Brown of continued detention has been by ICE.

therefore, Mr.Brown risk of erroneous deprivation id thus

markedly high. The second Circuit determined that the

competing government intrest in preventing a 1226(c)-

detained noncitizen from receiving a bond hearing is

minimal. The Court outlined that the government possesses

two primary interests in denying mandatorily-detained

7

noncitizens from receiving a bond hearing at this stage:
ensuring the noncitizen's appearance at proceedings and
protecting the

community from danger. *see id*. at 153-54. The court,
however,indicated these intrests are not undercut by the
relief

Mathews provides in a procedural sense. It assessed at any
ordered bond hearing, the IJ would assess on an
individualized basis whether the noncitizen detanees. *Id*.
Since the procedural protection that flows out of the first
two *mathews* factors does not overburden the government's
interest at the third factor,the court found relief
reasonable and necessary.

    16. In Zadvydas v. Davis, 533 U.S. 678 (2001), the
Supreme Court held that six months is the presumptively
reasonable period during which ICE may detain aliens in
order to effectuate their removal, *id*. at 702. Interim
administrative regulations also recognize that the HQPDU has
a six-month period for determining where there is a
significant likelihood of an alien's removal in the
reasonable foreseeable future, 8 C.F.R. §241.13(b)(2)(ii).

    17. Petitioner's order of removal became final on
December 18,2024. Petitioner has been in ICE custody since

8

April 26,2024. Therefore, the presumptively reasonable

removal period of six months for Petitioner ended on May

13,2024.


## LEGAL BACKGROUND

18. Section 236(c) of the Immigration and Nationality

Act,

as amended, provides that "the attorney General shall take

into

custody any alien who" is removable from this country

because he

has been convicted of one of a specified set of crimes. The

statute requires the Department of Homeland Security to take

into


 custody any alien who "is deportable" from the United

States based on having been convicted of any of a wide range

of crimes.

19. Petitioner was convicted for identity theft.  Even

though the crimes were  felonies it is respectfully

submitted that INA §236(c) and other mandatory detention

statutes are deemed unconstitutional by a majority of

courts. See Hoang v. Comfort, 282 F. 3d 1247 (10th Cir.

2002); Patel v. Zemski, 275 F. 3d 299 (3d Cir. 2001).


9

20. While it is established that inadmissible aliens or those subject to exclusion orders do not enjoy due process rights under the Fifth Amendment of the United States Constitution,

several district courts have affirmed that courts have the power and responsibility to review the government's exercise of detention in cases involving inadmissible aliens. See Zadvydas v.

Davis, 121 S. Ct. 2491, 2501 (2001) ("Aliens who have once passed

through our gates, even illegally, may be expelled only after

proceedings conforming to traditional standards of fairness encompassed in due process of law," quoting Shaughnessy v. United

States ex rel Mezei, 345 U. S. 206, 212 (1953)). See also Clark

v. Martinez, 125 S. Ct. 716, 160 L. Ed. 29 734, 73 ULLW 4100

(U.S. 2005).

21. Although Petitioner is  subject to a final order the removal and his detention is prolonged. The Supreme Court's

decision in Zadvydas that removable and excludable aliens
are situated differently before an order of removal is
entered. The Court went on to hold that both removalbe and
inadmissible aliens are entitled to be free from detention
that is arbitrary and capricious. The Court stated that six
months was the maximum period of post order detention that
was presumptively reasonable given the alien's fundamental
liberty interest, Zadvydas, 533 U. S. at 692.

    22. The Court in Patel v. Zemski, 275 F. 3d 299 (3d
Cir. 2001) also stated that under Zadvydas immigration
detention implicates a fundamental liberty interest and that
the INS is limited to a "period reasonably necessary to
bring about the
alien's removal generally no more than six month," _id_ at 209
citing Zadvydas, 533 U. S. at 692. Additionally, the Code of
Federal Regulations recognizes that the Service's
Headquarters
Post-Order Detention Unit (HQPODU) must make a determination
within a six month period as to whether there is a
significant
likelihood that the alien can be removed from the United
States
in the reasonably foreseeable future. See 8 C.F.R. §
241.13(b)(2)

(ii). Presumptive reasonable time established by the Supreme

Court. Such prolonged detention is arbitrary and capricious

since

Petitioner's removal to Ghana is not likely to occur in the

reasonable foresseable future.

23. Prior to the Supreme Court's decision in Zadvydas,

courts in the third circuit determined that aliens are not

subject to prolonged post-oder detention. See Chi Thon Ngo

v. INS, 192 F. 3d 390 (3rd Cir. 1999) ("Stakes are high and

we emphasize that grudging and perfunctory review is not

enough to satisfy the due process right to liberty, even for

aliens"). In Chi Thon Ngo, the court found that the statue

satisfied due process because it provided for "searching

periodic reviews" of the basis for detention but granted the

petitioner's writ of habeas corpus since he had not received

the "rigorous reviews of his eligibility for parole that due

process requires," id at 399.

24. Following Zadvydas, the Attorney General

promulgated regulations establishing a process for

determining the custody of aliens subject to prolonged

detention awaiting execution of a removal order, see 8

C.F.R. §241.13, which applies to aliens such as Petitioner

"who are subject to a final order of removal and

12

are detained under the custody review procedures provided at
section §241.4 after the expiration or removal period.
"Section

241.13 tracks <u>Zadvydas</u>'s mandate in that it requires a
deportable

alien to first establish a basis that removal in the
'reasonably

foreseeable future' is not possible," <u>Jabir v. Ashcroft</u>, No.
CIV.A.03-2480, 2004 WL 60318, at 85 (E.D. La. Jan. 8, 2004).

    25. A non-citizen who is detained may trigger HQPODU
review of whether there is a significant likelihood of
removal in the reasonably foreseeable future by written
request, 8 C.F.R. §

241.13(d). The HQPODU must respond to such a request within
ten business days, acknowledge the request, and explain the
process that will be followed to consider the request, 8
C.F.R. §241.13(e)(1). The HQPODU must assess the detainee's
cooperation with removal efforts in addition to factors such
as the history of ICE's "efforts to remove aliens to the
country in question of third countries, . . . the ongoing
nature of efforts to remove this alien, . . . the
reasonably foreseeable results of those efforts, the views
of the Department of State regarding the prospects of

removal of aliens to the country or countries in question,
and the receiving country's willingness to accept the alien
into its territory," 8 C.F.R. §241.13(f). According to the
regulations, while "there is no presumptive period of time
within which the alien's removal must be accomplished, . . .
the prospects of the timeliness of removal must be
reasonable under

the circumstances," 8 C.F.R. §241.13(g). If HQPODU
determines

that there is no significant likelihood that the alien will
be

removed in the reasonable foreseeable future, the alien is
to be

released, upon appropriate conditions, unless "special
circumstances" exist, 8 C.F.R. §241.13(g)(1).

26. Special circumstances allowing the continued
detention

of non-citizen who are subject to removal but unlikely to be
removed in the reasonably foreseeable future include those
who pose a special safety risk to the public, in the sense
that they

carry contagious diseases, 8 C.F.R. §241.14(b); pose serious
adverse foreign policy consequences, 8 C.F.R. §241.14(c);

14

are being detained because of anti-terrorism concerns, 8

C.F.R. §241.14(d); or have been determined to be "specially

dangerous," either because of the alien's criminal record or

by virtue of mental illness, 8 C.F.R. §241.14(f).

27. In the instant case, Petitioner had not received a

"searching periodic review" of his custody status. ICE has

never asserted that special circumstances exist to justify

Petitioner's prolonged detention, or that Petitioner poses a

danger to national security or that he's a flight risk.

Thus, Petitioner alleges that his detention violates both

substantive and

procedural due process insofar as ICE has failed to conduct

a periodic review of his status in accordance with its own

procedures and has made no determination that he posed

either a

danger to society or a flight risk.

28. This Court should grant Petitioner's writ of habeas

corpus because the government has failed to acknowledge its

compliance with all of the obligations of his detention or

provide another valid reason for his continued detention,

and his

unjustly prolonged detention deprives Petitioner of his

liberty,

see Chi Thon Ngo, 192 F. 3d at 393. There is no justifiable

15

reason for his continued detention. Since Petitioner's detention has continued beyound the six-month post removal order period,

 his continued detention should be deemed an unlawful deprivation of his liberty, see Zadvydas, 522 U. S. 678.

29. Petitioner further contends that his prolonged detention without the possibility of bond violates the United States Constitution. Petitioner respectfully requests that this honorable court consider as persuasive authority the decision of the United States Court of Appeals for the Third Circuit with respect to the application of the time limiting provision of 8 U.S. C. §1226 as preventing the prolonged detention of inadmissible or excludable aliens, see Patel v. Zemski, 275 F. 3d 299 (3d Cir. 2001) (holding that mandatory detention of aliens after they have been found subject to removal violates their due process rights unless they have been afforded the opportunity for an individualized hearing at which they can show that they do not pose a flight risk or danger to the community); Chi Thon Nog v.
INS, 192 F. 3d 390, 398 (3d Cir. 1999) (same).

## FIRST CLAIM FOR RELIEF

16

30. Petitioner re-alleges and incorporates by reference paragraphs 1 through 29 as is set forth fully herein.

31. The government is illegally detaining Petitioner because
he has been in custody for over 6 months and he will not be able to be removed to Ghana in the reasonably foreseeable future.

32. Petitioner's continued detention by Respondent is

unlawful and contravenes 8 U. S. C. §1231(a)(6) as interpreted by the Supreme Court in Zadvydas. The six month presumptively reasonable period for removal efforts has expired. Petitioner still has not been removed and he continues to languish in detention. Petitioner's removal to Ghana or any other country is not significantly likely to occur in the reasonably foreseeable future. The Supreme Court held in Zadvydas that the ICE's continued detention of someone like Petitioner under such circumstances is unlawful.

33. Petitioner requests that the government show cause why his continued detention is justified.

<u>SECOND CLAIM FOR RELIEF</u>

34. Petitioner re-alleges and incorporates by reference paragraphs 1 through 33 above as set forth herein.

17

35. Petitioner alleges that in light of the equities in this

case, his prolonged detention more than six months violates his

right to substantive due process under the Fifth Amendment of the

United States Constitution.

36. The Due Process Clause of the Fifth Amendment requires

that the deprivation of Petitioner's liberty be narrowly tailered

to serve a compelling government interest. While respondents

would have an interest in detaining Petitioner in order to

effectuate removal, that interest does not justify his

indefinite detention. <u>Zadvydas</u> recognized that ICE might

continue to detain


aliens only for a period reasonably necessary to secure the

alien's removal. The presumptively reasonable period during

which ICE may detain an alien is only six-months. Petitioner

has already been detained in excess of six months and his

removal is not significantly likely to occur in the

reasonably foreseeable future.

<u>THIRD CLAIM FOR RELIEF</u>

18

37. Petitioner re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 36 as set forth fully herein.

38. Petitioner alleges that in light of the equities in this
case, his prolonged detention more than six months without a meaningful review of his detention in accordance with federal regulations violates his right to procedural due process under the Fifth Amendment of the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Honorable Court grant
the following relief:

1) Assume jurisdiction over this matter;

2) Issue an order requiring respondents to promptly release
Petitioner because there is no likelihood that he will be removed to Ghana in the reasonably foreseeable future;

3) Order the Attorney General and his agents not to remove

Petitioner from the jurisdiction of this Court during the

19

duration of the consideration of this petition.

4) Grant any other and further relief that this Court deems just and proper.

I affirm, under penalty of perjury, that the foregoing is true and correct. Respectfully submitted this date on May 22, 2025.

Andraus 205-989-748

Andrews Oduro Brown A#

205-989-748

Pro-se Litigant
Buffalo Federal Detention
Facility 4250 Federal Drive
Batavia, New York 14020

# CERTIFICATE OF SERVICE

I, Andrews Oduro Brown A#205-989-748, hereby depose and say, that on May 22, 2025. I enclosed inside a United States Postal service Box/ Envelope, sent a true and certified copy of Motion for Appointment of Counsel. Statement Pursuant to 28 U.S.C & 1746, i Declare, under the penalty of Perjury under the laws of the United States of America, and handed the following documents to the authority of Buffalo Federal detention facility (BFDF) staff for mail and delivery. The foregoing is true and correct to the other party.

Located at the following address:


Kenneth B. Keating Federal Building
100 State Street, room 2120
Rochester, New York 14614



Sworn to before me this_____

day of _____,20____.
Pro-se

Facility

Respectfully Submitted,

*Andrews*

Andrew Oduro Brown

Buffalo Federal Detention

4250 Federal Drive
Batavia, NY 1402

_____
Notary Public

# CERTIFICATE OF SERVICE

I, Andrews Oduro Brown A#205-989-748, hereby depose and say, that on March__,2025. I enclosed inside a United States Postal service Box/ Envelope, sent a true and certified copy Motion To Proceed in Forma Pauperis. Statement Pursuant to 28 U.S.C & 1746, i Declare, under the penalty of Perjury under the laws of the United States of America, and handed the following documents to the authority of Buffalo Federal detention facility (BFDF) staff for mail and delivery. The foregoing is true and correct to the other party.

Located at the following address:

Kenneth B. Keating Federal Building
100 State Street, room 2120
Rochester, New York 14614

Sworn to before me this_____

day of _____,20____.

Facility

Respectfully Submitted,

_Andrews Oduro_

_____
 Andrews Oduro Brown
Buffalo Federal Detention

4250 Federal Drive
Batavia, NY 1402

_____
Notary Public

# CERTIFICATE OF SERVICE

I, Andrews Oduro Brown A#205-989-748, hereby depose and say, that on May 22,2025, I enclosed inside a United States Postal service Box/ Envelope, sent a true and certified copy of HABEAS CORPUS Statement Pursuant to 28 U.S.C & 1746, i Declare, under the penalty of Perjury under the laws of the United States of America, and handed the following documents to the authority of Buffalo Federal detention facility (BFDF) staff for mail and delivery. The foregoing is true and correct to the other party.

Located at the following address:

Kenneth B. Keating Federal Building
100 State Street
Rochester, New York 14614

Sworn to before me this_____

day of _____,20____.
Pro-se

Facility

Respectfully Submitted,

Andraes

Andrews oduro Brown

Buffalo Federal Detention

4250 Federal Drive
Batavia, NY 1402

_____
Notary

23

Docket #
25-CV-6272

*Exhibits* (B) (G)

sponsors letter

Docket #
25-cv-6272

**Andrews Oduro**
**A#: 205-989-748**
Buffalo Federal Detention Facility
4250 Federal Drive, Batavia
New York 14020

May 26,2025

**The Honorable Judge**
Federal Court
Kenneth B. Keating Federal Building
100 State Street, Room 2120
Rochester, New York, 14614

Dear Honorable Judge ,

I Andrews Oduro, came to the United States on my own volition to pursue an American dream in a great country; along the way, I made some consequential choice[s] which I take full responsibility for and was punished and duly do the time for. I wish I can take it all back because there is no excuse for ignorance, hence there is no excuse for what I did and I am deeply sorry for everything and everybody my action may have affect in one way or the other.

I am well aware of my precarious situation and that any violation of any bond condition[s] giving to me will surely land me back in detention center if not in prison which I have vowed that I am not going back again after all what I have been through this past several years being incarcerated.

I have had a moment of self reflection while incarcerated and engaging in crime again after all what I have saw in prison is far off my mind. I am not getting younger anymore and I don't want to spend the rest of my life behind bar hence I

1

am ready to do everything to show this honorable court that the believe and trust of the people that wrote letter on my behalf is not betrayed in anyway shape or

Docket #
25-CV-6272

*Exhibits* ~~(B)~~ *(G)*

sponsors letter

Docket #
25-CV-6272

**Andrews Oduro**
**A#: 205-989-748**
Buffalo Federal Detention Facility
4250 Federal Drive, Batavia
New York 14020

May 26,2025

**The Honorable Judge**
Federal Court
Kenneth B. Keating Federal Building
100 State Street, Room 2120
Rochester, New York, 14614

Dear Honorable Judge ,

I Andrews Oduro, came to the United States on my own volition to pursue an American dream in a great country; along the way, I made some consequential choice[s] which I take full responsibility for and was punished and duly do the time for. I wish I can take it all back because there is no excuse for ignorance, hence there is no excuse for what I did and I am deeply sorry for everything and everybody my action may have affect in one way or the other.

I am well aware of my precarious situation and that any violation of any bond condition[s] giving to me will surely land me back in detention center if not in prison which I have vowed that I am not going back again after all what I have been through this past several years being incarcerated.

I have had a moment of self reflection while incarcerated and engaging in crime again after all what I have saw in prison is far off my mind. I am not getting younger anymore and I don't want to spend the rest of my life behind bar hence I

1

am ready to do everything to show this honorable court that the believe and trust of the people that wrote letter on my behalf is not betrayed in anyway shape or

form. I am hardworking and I have two young daughter's and four son's I know what my choice[s] have cost them by not being around for them all this years.

To show my genuine and deep regret during incarceration, I have dedicated myself to correcting my behavior and my thinking that led me to prison. I am making priority to work on myself to be a better human being. I had work through to prepare myself, to be a better person, an upstanding Citizen, a loving friend and father to my children and a productive member of the society.

 But to keep me in immigration detention indefinitely because of my  past crime, which I had been punished for, is gross injustice. Quote:["To presume dangerousness to the community and risk of flight based solely on an individual past record does not satisfy due process. Presenting danger to the community at one point by committing a crime does not place one's forever- beyond redemption."]

 Once again, my intention is to stay in American, hence I have no reason to flew. I have no meant whatever, none desire to engage or do anything that will violate any bond condition giving to me. I am seeking for a relief to stay in this country by filing for "withholding of Removal and Convention against Torture"; and I am still contesting my de portability and  knows that any violation of law, either criminal or immigration, will land me back in detention. I do not have any prior criminal conviction(s) or lengthy criminal history apart from the one time I was convicted of a non violent crime; and I have never had any disciplinary issues during incarceration; and none at the immigration facility that I am detained.

I had taken several life changing programs while incarcerated , and also during my immigration detention. I have attended seminars, workshop in prison reform and rehabilitation, and speaker that came to talk to us in prison on how to move our life forward crime free and being a productive member of the society. I am a total change person and all I asked for is a second chance to prove this.

I am exhausted emotionally, physically, and mentally, due to all these legal issues and has been subjected to various ailments which I do not have before my

2

incarceration, and I am on various medications raging from mental illness, diabetes, High blood pressure, prostrate and bladder issues, to mention but a few.

All this can easily be accessed on my medical records by the court which I believe is part of evidence submit by my attorney.

I, therefore, respectfully pray that this Honorable court take the time that I have spent in incarceration, and the time I am presently spending in immigration detention into consideration while making this decision. I am very much aware that being granted release on bond and supervision doesn't mean that my ongoing immigration proceeding is over, but it will at least give me time to be with my family and love ones and adequately take care of myself while proceeding with my immigration case outside the detention facility.

In sum, I kindly request the court to reconsider my prolonged detention by granting me this bond, and I promised to abide by the conditions of my release and this I pledge.

Thank you sir for your prudence.

Respectfully Submitted,

*Andrew Oduro*

Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, New York 14020

DATED: 5/26/25
Batavia, NY

Docket #
25-CV-6272



# Masjid Haq Wal Iman



141 Alexandra Avenue Bronx NY 10454
E-mail: masjidhaqwaliman@gmail.com Tel: (646) 883 3530

Sheikh Imam Abubakar

Imam

Masjid Haq Wal Iman Inc.

Dear  Honorable Judge,

My name is Sheikh Imam Abubakar. I have been an Imam for 8 years and met Andrews Oduro Brown through our shared faith. I am an Imam at Masjid Haq Wal Iman in Bronx, New York.

Mr. Brown has been a member of the mosque since he came to the United States. Since then, he has often called me with questions about Islam and to discuss ways to improve his faith.

Mr. Brown was frequently at the mosque and would sometimes bring his children to learn about the faith. If he did not have to work, Mr. Brown was at the mosque for all five daily prayers. Mr. Brown celebrated Ramadan with the mosque community, stepping in to serve food to those who came to eat and helping to clean up after the meals. He is a regularly attending member of the mosque community.

May God bless!
Thank you,

Sincerely,

Imam Abubakar



**YANKASA ASSOCIATION OF USA, INC.**
A GHANAIAN NON-PROFIT ISLAMIC AND CULTURAL ORGANIZATION
1707 TOWNSEND AVENUE
BRONX, NEW YORK 10453
TEL: (347)-726-4170    FAX: (347)-862-6705
WEB: www.yankassa.org    E-MAIL: info@yankassa.org

Sir/Madam,

### TO WHOM IT MAY CONCERN

This is to attest that Mr. Andrew Oduro Brown is a member of Yankasa Association in good standing. The community and its religious leaders know about him, and he always participates in community functions and programs.

Yankasa is a socio-economic and religious association representing Africans in the diaspora living in the United States of America. Mr. Brown has been active in the community attending functions and donating generously to the community whenever we needed to raise funds to support programs like food pantry, funeral fund, etc.

Mr. Brown has been in the custody of the U.S. Immigration and Customs Enforcement (**ICE**) for some time now, and this has displaced his family, especially his children. His children are under foster care because there is no one to care for them. They are minors and they need their father to maintain their mental health.

Mr. Brown normally helps with community services such as clean-up exercises at our premises, cooking for big functions, and other community services. He is hardworking, trustworthy, and above all, very honest.

The community is by this letter appealing to the U.S. Immigration and Customs Enforcement (**ICE**) to release him so that he can reunite with his family and continue to offer services to our community. He is a good man, and we have missed his dedicated services to our children and the community.

I hope this testimony will be given favorable consideration in any matters concerning.

Sincerely,

Alhaji Suwari
Secretary

**YANKASA ASSOCIATION**
**1707 Townsend Avenue**
**P.O.Box 1450, Bronx NY 10453**



Endorsements / Mentions Spéciales / Anotaciones

If your passport expires within six months of your date of departure, you may be denied entry into some countries.

SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR



PASSPORT
PASSEPORT / PASAPORTE

THE UNITED STATES OF AMERICA

Type/Type/Tipo — **P**   Code/Code/Código — **USA**   Passport No./No. du Passeport/No. de Pasaporte — **A11152257**

USA

Surname/Nom/Apellidos
**SHUAIB**

Given Names/Prénoms/Nombres
**ALAZIZ**

Nationality/Nationalité/Nacionalidad
**UNITED STATES OF AME**

Date of birth/Date de naissance/Fecha de nacimiento
**06 JUN 1969**

Sex/Sexe/Sexo **M**

Place of birth/Lieu de naissance/Lugar de nacimiento
**GHANA**

Date of issue/Date de délivrance/Fecha de expedición
**07 OCT 2022**

Date of expiration/Date d'expiration/Fecha de caducidad
**06 OCT 2032**

Authority/Autorité/Autoridad
**UNITED STATES DEPARTMENT OF STATE**

P<USASHUAIB<<ALAZIZ<<<<<<<<<<<<<<<<<<<<<<<<<<<
A111522574USA6906067M3210064950049563<788976

# Appealing for leniency

October 24, 2024

To Whom It May Concern,

I, *Al-Aziz Shuaib*, here to plead for leniency on Mr. *Andrews Oduro Brown*, whom I have personally known since his childhood. Mr. Brown is a kind person, who helps people in the community whenever he sees that help is needed. He has never had a bad word to say about anyone.

Mr. Brown is a family-oriented person and has a strong bond with his children. Separation has caused a turmoil for both him and the children. The unification of the family is one of the reasons why I am pleading for leniency on his serving time.

I will ensure that Mr. Brown will comply with all the conditions of his release and attend all future court dates if the leniency is granted and released him out of incarceration.

Thank you very much in advance for your time. I may be contacted at telephone number: (914) 207-9244, e-mail: az.shuaib@gmail.com.

Sincerely yours

Al-Aziz Shuaib

SUBSCRIBED
this
of New York )
STATE
County of Westchester ) SS-
AND Sworn to before
10/24/24
NOTARY Public

Joseph Cinicolo
Notary Public, State of New York
Reg. No. 01CI6027568
Qualified in Westchester County
Commission Expires August 5, 2028

November 21, 2024

To Whom It May Concern:

### Appeal for Compassionate Release of Inmate Andrew Oduro Brown

Dear Immigration Officer's,

I am writing to formally appeal for the compassionate release of Andrew Oduro Brown, a current inmate at [Prison Name].

Andrew Oduro Brown is the sole breadwinner and primary caregiver for his family, which includes young children. His absence has created a significant hardship for his family, causing financial instability and emotional distress.

The family are facing hardships, such as loss of income, difficulty accessing healthcare, and an emotional trauma.

I believe that Andrew Oduro Brown poses no threat to society and has demonstrated positive behavior while incarcerated. [Provide any relevant information about the inmate's good conduct, participation in rehabilitation programs, or any other positive contributions while in prison.]

I urge you to consider the exceptional circumstances of Andrew Oduro Brown and grant his request for compassionate release. His return to his family would not only alleviate their suffering but also contribute to the overall well-being of the community.

Thank you for your time and consideration of this urgent matter.

Sincerely,

Munira Larry Bako
Cousin
315 E 102nd Street Apt 412
New York, NY 10029
929-476-1148

315 E 102nd Street Apt 412
New York, NY 10029

November 21, 2024

To Whom It May Concern:

## Request for Compassionate Release of Inmate Andrew Oduro Brown

Dear honorable Immigration Officer's,

I am writing to humbly request the compassionate release of my cousin, Andrew Oduro Brown who is currently incarcerated at Seneca County. As his sister, I am deeply concerned about the well-being of his children, who are currently under the care of a caregivers and foster home.

Andrew Oduro Brown has been incarcerated for years, and his children have been deprived of his presence and guidance for much of their lives. Due to age, health, or inability to provide adequate care, their current situation is becoming increasingly unstable.

Andrew Oduro Brown has a strong family support system, including myself and some family friends, who are committed to providing him with the necessary resources and support upon his release. We believe that he would be a dedicated and responsible parent, capable of providing a loving and stable home for his children.

I am attaching copies of relevant documents, such as proof of family relationship, character references letter, and evidence of the children's situation. I kindly request that you consider my request and grant Andrew Oduro Brown compassionate release so that he can reunite with his children and provide them with the care and support they so desperately need.

Thank you for your time and consideration.

Sincerely,

Munira Larry Bako
315 E 102nd Street Apt 412
New York, NY 10029
929-476-1148

November 21, 2024

To Whom It May Concern:

**APPEAL FOR COMPASSIONATE RELEASE OF INMATE ANDREW ODURO BROWN**

Dear Immigration Officer's,

I am writing to formally appeal for the compassionate release of Andrew Oduro Brown, an inmate currently detained at Seneca County.

I understand that the decision to grant compassionate release is a serious matter, and I am making this request with the utmost sincerity and respect for the legal process. I believe that Andrew Oduro Brown meets the criteria for compassionate release due to the following compelling circumstances:

1. Andrew Oduro Brown is the sole caregiver for his minor children. His absence has caused significant hardship for the children, both emotionally and financially. The children have been placed in foster care.

2. Andrew Oduro Brown has strong ties to the community and has been a productive member of society prior to his incarceration. His deportation would sever his ties with his children and cause irreparable harm to their well-being.

3. Andrew Oduro Brown has demonstrated positive behavior while in detention and has participated in rehabilitation programs. His character and commitment to change make him a suitable candidate for compassionate release.

I respectfully request that you consider my appeal and grant Andrew Oduro Brown compassionate release so that he can be reunited with his children and provide the care and support they desperately need.

Thank you for your time and consideration.

Sincerely,

Munira Larry Bako
315 E 102nd Street Apt 412
New York, NY 10029
929-476-1148

Sworn to Before Me

This _____ day of. _____ 20. ____

_____

(Signature)

Mary M. Caram
Notary Public - State Of New York
No. 01CA6065392
Qualified in New York County
My Commission Expires 8/27/25





Docket #

25-cv-6272

*Exhibits* (A) ( H )

My wife appeals on our case

Docket #
25- cv-6272

**ADDENDUM**

24-4394

# United States Court of Appeals
### *for the*
## Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

CHARMAINE MIESHA BROWN,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

## BRIEF OF APPELLANT

Stuart A. Berman
LERCH, EARLY & BREWER, CHARTERED
7600 Wisconsin Avenue, Suite 700
Bethesda, Maryland 20814
(301) 657-0729

*Counsel for Appellant*



CP COUNSEL PRESS    (800) 4-APPEAL · (JOB 811246)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ iii

JURISDICTIONAL STATEMENT ................................................ 1

ISSUES PRESENTED.................................................................. 1

STATEMENT OF THE CASE....................................................... 2

   I.   THE CHARGES................................................................ 2

   II.   TRIAL AND VERDICT .................................................... 3

      A.   The Government's Evidence........................................ 3

         1.   Count One: Passport Fraud.................................. 4

         2.   Count Two: Wire Fraud Conspiracy ................... 7

         3.   Bankruptcy Offenses (Counts Four and Five)...... 9

      B.   Evidence Supporting a Necessity Defense ................ 10

      C.   Verdict........................................................................ 15

   III.   SENTENCING ................................................................ 15

SUMMARY OF ARGUMENT ...................................................... 16

STANDARDS OF REVIEW .......................................................... 18

ARGUMENT ................................................................................ 19

   I.   BECAUSE THE GOVERNMENT OFFERED NO
      EVIDENCE TO CONTROVERT BROWN'S NECESSITY
      DEFENSE, THE EVIDENCE WAS INSUFFICIENT TO
      SUSTAIN HER CONVICTIONS ON COUNT ONE AND
      TWO, AND THE DISTRICT COURT ERRED IN
      DENYING HER MOTION FOR JUDGMENT OF
      ACQUITTAL .................................................................. 19

II.   THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN
      BROWN'S CONVICTION ON COUNT TWO FOR
      VIOLATING 18 U.S.C. § 1349 WHERE THE
      GOVERNMENT FAILED TO PROVE AN AGREEMENT
      THAT COVERED ALL ELEMENTS OF THE WIRE
      FRAUD STATUTE................................................22

III.  COUNT FOUR SHOULD BE REVERSED BECAUSE THE
      INDICTMENT INCORRECTLY CHARGED THAT A
      TRUSTEE COULD BE THE VICTIM OF A VIOLATION
      OF 18 U.S.C. § 157 AND THE JURY INSTRUCTIONS
      PERMITTED A GENERAL VERDICT THAT INCLUDED
      THIS INVALID THEORY ........................................30

IV.   THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN
      BROWN'S CONVICTIONS ON COUNTS FOUR AND
      FIVE BECAUSE THE GOVERNMENT FAILED TO
      PROVE BEYOND A REASONABLE DOUBT HER
      SPECIFIC INTENT TO DEFRAUD CREDITORS AND
      LACK OF GOOD FAITH...........................................33

V.    THE GOVERNMENT FAILED TO PROVE THE
      MATERIALITY OF THE ALLEGED FACTS
      STATEMENTS IN COUNT FIVE................................36

VI.   BROWN'S SENTENCE WAS SUBSTANTIVELY
      UNREASONABLE..................................................38
                                                              42

CONCLUSION.........................................................

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ciminelli v. United States,*
  598 U.S. 306 (2023).................................................................25

*Gall v. United States,*
  552 U.S. 38 (2007)......................................................... 18, 19, 39

*Griffin v. United States,*
  502 U.S. 46 (1991).................................................................32

*Hedgpeth v. Pulido,*
  555 U.S. 57 (2008).................................................................32

*Jackson v. Virginia,*
  443 U.S. 307 (1979)......................................................... 18, 21

*Kann v. United States,*
  323 U.S. 88 (1944).................................................................26

*Parr v. United States,*
  363 U.S. 370 (1960).................................................................26

*Pasquantino v. United States,*
  544 U.S. 349 .................................................................25

*Rehaif v. United States,*
  588 U.S. 225 (2019).................................................................33

*Schmuck v. United States,*
  489 U.S. 705 (1989)......................................................... 25, 26

*Stromberg v. California,*
  283 U.S. 359 (1931).................................................................32

*United States v. Allmendinger,*
  706 F.3d 330 (4th Cir. 2013) ......................................... 19, 39

*United States v. Al-Rekabi,*
  454 F.3d 1113 (10th Cir. 2006) ...................................20

*United States v. Bailey,*
  444 U.S. 394 (1980).................................................................20

*United States v. Banks,*
  104 F.4th 496 (4th Cir.) .................................................................................33

*United States v. Barronette,*
  46 F.4th 177 (4th Cir.) ..................................................................................33

*United States v. Cassidy,*
  616 F.2d 101 (4th Cir. 1979) .........................................................................21

*United States v. Claybrooks,*
  90 F.4th 248 (4th Cir. 2024) ..........................................................................42

*United States v. Crittendon,*
  883 F.2d 326 (4th Cir. 1989) ................................................................... 20, 21

*United States v. Frost,*
  125 F.3d 346 (6th Cir. 1997) .........................................................................28

*United States v. Gellene,*
  182 F.3d 578 (7th Cir. 1999) .........................................................................37

*United States v. Green,*
  436 F.3d 449 (4th Cir. 2006) ................................................................... 18, 41

*United States v. Hampton,*
  441 F.3d 284 (4th Cir. 2006) .........................................................................19

*United States v. Hartsel,*
  199 F.3d 812 (6th Cir. 1999) .............................................................. 27, 28, 29

*United States v. Hope,*
  28 F.4th 487 (4th Cir. 2022) ................................................................... 18, 33

*United States v. Hughes,*
  401 F.3d 540 (4th Cir. 2005) .........................................................................36

*United States v. Lane,*
  474 U.S. 438 (1986).......................................................................................30

*United States v. Louthian,*
  756 F.3d 295 (4th Cir. 2014) ................................................................... 19, 39

*United States v. Martin,*
  520 F.3d 87 (1st Cir. 2008)............................................................................41

*United States v. Maze,*
  414 U.S. 395 (1974).............................................................................*passim*

*United States v. Milwitt,*
  473 F.3d 1150 (9th Cir. 2007) ................................................................31

*United States v. Moody,*
  2 F.4th 180 (4th Cir. 2021) ..................................................................18

*United States v. Mooney,*
  497 F.3d 397 (4th Cir. 2007) ................................................................21

*United States v. Nabaya,*
  765 F. App'x 895 (4th Cir. 2019) ..........................................................36

*United States v. Naegele,*
  367 B.R. 1 (D.D.C. 2007) .....................................................................37

*United States v. Nance,*
  957 F.3d 204 (4th Cir. 2020) ................................................................42

*United States v. Panter,*
  688 F.2d 268 (5th Cir. 1982) ................................................................21

*United States v. Phillips,*
  704 F.3d 754 (9th Cir. 2012) .......................................................... 27, 29

*United States v. Quan,*
  358 F. App'x 854 (9th Cir. 2009) ..........................................................31

*United States v. Quilty,*
  741 F.2d 1031 (7th Cir. 1984) ..............................................................21

*United States v. Skinner,*
  2023 WL 2770952 (4th Cir. Apr. 4, 2023) ............................................31

*United States v. Spurlin,*
  664 F.3d 954 (5th Cir. 2011) ................................................................31

*United States v. Stanley,*
  597 F.2d 866 (4th Cir. 1979) ................................................................32

*United States v. Tavares,*
  844 F.3d 46 (1st Cir. 2016) ............................................................ 28, 29

*United States v. Yagman,*
  345 F. App'x 312 (9th Cir. 2009) ..........................................................31

*United States v. Yagow,*
  953 F.2d 427 ......................................................................................37

*United States v. Yurek,*
  925 F.3d 423 (10th Cir. 2019) .................................................................31

*Yates v. United States,*
  354 U.S. 298 (1957) .................................................................................32

**Statutes & Other Authorities:**

18 U.S.C. § 152 ..............................................................................................31

18 U.S.C. § 152(3) ............................................................................ 3, 35, 36, 37

18 U.S.C. § 157 .................................................................................. 1, 17, 30, 31

18 U.S.C. § 157(1) ...........................................................................................3

18 U.S.C. § 371 ...............................................................................................2

18 U.S.C. § 922(g) ..........................................................................................33

18 U.S.C. § 1028A .................................................................................. *passim*

18 U.S.C. § 1028A(b)(3) .................................................................................38

18 U.S.C. § 1341 ............................................................................................25

18 U.S.C. § 1343 .............................................................................................2

18 U.S.C. § 1349 ................................................................................... 2, 22, 23

18 U.S.C. § 1542 .............................................................................................2

18 U.S.C. § 3231 .............................................................................................1

18 U.S.C. § 3553 ............................................................................................18

18 U.S.C. § 3553(a) ............................................................................. 19, 39, 42

18 U.S.C. § 3553(a)(6) ...................................................................................41

18 U.S.C. § 3742 .............................................................................................1

28 U.S.C. § 1291 .............................................................................................1

Fed. R. Crim. P. 29(a) ............................................................................. 15, 18

Identity Theft Investigation and Penalties: Hearing on H.R. 1731 Before the
  H. Subcomm. on Crime, Terrorism, and Homeland Security, 108th Cong. .......40

## JURISDICTIONAL STATEMENT

The district court possessed jurisdiction over this federal criminal case under 18 U.S.C. § 3231. It sentenced defendant Charmaine Miesha Brown ("Brown") on July 23, 2024 and entered its written judgment on July 24, 2024. JA932-938. Brown filed a timely notice of appeal on July 24, 2024. JA939-940.

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUES PRESENTED

1.  Did the district court err in denying Brown's motion for judgment of acquittal on Counts One and Two despite uncontroverted evidence supporting her necessity defense?

2.  Did the government present insufficient evidence to prove the wire fraud conspiracy in Count Two because it failed to prove an agreement that involved the close relationship between the alleged fraud scheme and the alleged interstate wire communication required by *United States v. Maze*, 414 U.S. 395 (1974)?

3.  Did the district court commit plain error with regard to the bankruptcy fraud charge in Count Four because the indictment charged an invalid theory — that a bankruptcy trustee can be the victim of a violation of 18 U.S.C. § 157 — and the jury instructions permitted a general verdict that included that invalid theory of guilt?

4.    Did the government present insufficient evidence to prove Brown's specific intent to defraud creditors and lack of good faith with regard to the bankruptcy fraud charge in Count Four and the false statement charge in Count Five?

5.    Did the government present insufficient evidence to prove the materiality of the alleged false statement in Count Five?

6.    Where Brown and her equally culpable co-defendant were both convicted of conspiracy and fraud charges, but she was acquitted of a charge under 18 U.S.C. § 1028A for which he was convicted and received a mandatory minimum sentence, was Brown's sentence substantively unreasonable when it was *seven-and-a-half times* longer than the co-defendant's sentence for their overlapping counts of conviction?

## STATEMENT OF THE CASE

### I.    THE CHARGES

On April 27, 2022, a grand jury in the District of Maryland returned a five-count indictment against Brown and Andrews Oduro Brown, a/k/a Andrews Oduro ("Oduro"). JA25-37. Count One charged Brown and Oduro under 18 U.S.C. § 371 with conspiracy to commit passport fraud, in violation of 18 U.S.C. § 1542. Count Two charged the defendants under 18 U.S.C. § 1349 with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1343. Count Three charged the defendants with aggravated identity fraud under 18 U.S.C. § 1028A. Count Four charged the

defendants with bankruptcy fraud, in violation of 18 U.S.C. § 157(1). Count Five charged the defendants with making a false statement in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3).

Pursuant to a plea agreement, Oduro pleaded guilty to Counts One, Three, and Four, with a statement of facts that also captured the conduct in Counts Two and Five. JA38-51. The district court sentenced Oduro to concurrent prison terms of four months on Counts One and Four and a consecutive term of 24 months on Count Three, for a total of 28 months. JA89-90.

## II.    TRIAL AND VERDICT

The district court conducted a six-day jury trial on April 15-18 and April 23-24, 2024. JA15-16.

### A.    The Government's Evidence

The government's evidentiary summary in the Presentence Report ("PSR") sets forth the essential facts it presented during its case. JA1689-1694. Born in Pennsylvania, Brown is a United States citizen. Oduro is a Ghanaian national who entered the United States in or about May 2013. Brown and Oduro married in or about January 2014 and lived in the same household until Oduro's arrest and subsequent detention. They lived in Maryland beginning in approximately June 2015. Before she met Oduro, Brown had four biological children (including K.B.) who are U.S. citizens. Before he met Brown, Oduro had two biological children

3

(S.O. and B.O.) in Ghana who are Ghanaian nationals. Brown did not obtain a U.S. passport or travel abroad until 2015 and has never been to Ghana.

### 1.  Count One: Passport Fraud

On or about March 10, 2014, Brown submitted I-130 Petitions for Alien Relative seeking immigration entry into the United States for S.O. and B.O. After immigration authorities denied the petitions, Brown was eligible to, but did not, reapply for the admission of S.O. and B.O.

**S.O. Passport:** On or about December 1, 2014, Brown submitted to the U.S. Department of State a DS-11 Application for a U.S. Passport, using the name and personal information of her child, K.B. Brown signed the application, declaring under penalty of perjury that "the photograph attached to this application is a genuine current photograph of [the applicant]," among other things. In the application for a passport for K.B., Brown attached and submitted to the State Department a photo of S.O. that she obtained from Oduro. The State Department approved the application on or about December 17, 2014.  On or about March 2, 2015, S.O. used the U.S. passport in K.B.'s name to travel from Ghana and enter the United States.  U.S. Customs and Border Protection travel records show no record of K.B. previously having left the United States.

On or about March 16, 2016, Brown signed and submitted an application to the U.S. Department of State for a U.S. passport in S.O.'s own name. Brown

represented on the application that she was his mother, and provided a fraudulent Ghanaian birth certificate dated May 2014, listing her as the mother of S.O., born in August 2010 in Ghana. Brown could not have given birth to S.O. in August 2010 in Ghana because (1) she gave birth to K.B. in the United States in November 2010, and (2) Brown did not have a U.S. passport prior to 2015 and had never traveled out of the United States. The government approved S.O.'s application and issued a passport in April 2016.

On or about April 26, 2021, Brown and Oduro submitted a signed application to renew S.O.'s fraudulently obtained U.S. passport, using as supporting documentation S.O.'s April 2016 passport and the same fraudulent Ghanaian birth certificate listing S.O. as being born to Brown in Ghana in August 2010. The government approved the application the same day.

**S.O. Passport:** Brown unsuccessfully applied for a visitor visa for B.O. in January 2019. On or about March 17, 2020, at a post office in Washington Grove, Maryland, Brown and Oduro submitted a signed application for a U.S. passport for B.O., under the name B.C.B. Brown and Oduro provided a fraudulent Ghanaian birth certificate dated May 2014, listing Brown as the mother of B.O., born in November 2012 in Ghana. Brown also signed and submitted letters in support of the application and claimed to have lived in Ghana for extended periods of time in 2010 and 2012. One letter purported to "verify Charmaine Brown addresses current and past," and

claimed that Brown lived in Ghana between September 2012 and December 2012 (when B.O. was born), and April 2010 until September 2010 (when S.O. was born). These statements were false because Brown did not have a U.S. passport and had never traveled out of the United States prior to 2015.

The government approved the application and issued a U.S. passport to B.O. (under the name B.C.B.) in July 2020. B.O. used this fraudulently obtained U.S. passport to travel from Ghana and enter the United States on or about October 6, 2020.

Emails show that the Ghanaian birth certificates for S.O. and B.O. were obtained from "Bigdreams Business Ventures," with the email address bigdreamsgh@gmail.com. The birth certificates originally incorrectly listed Oduro as "Anderson Oduro," which was later corrected to "Andrews Oduro." Oduro forwarded the corrected birth certificates to Brown, who responded, "Beautiful."

In May 2021, Brown and Oduro appeared in person at a U.S. Customs and Immigration Services office for Oduro's green card interview. The interview was audio and video recorded. Brown and Oduro each took an oath to tell the truth. When the immigration officer asked Oduro where his biological children "live presently," Oduro claimed that they lived in Ghana. Oduro further claimed that he and Brown supported his children in Ghana by sending them "money, school fees, and clothes." When the immigration officer asked Brown when she last sent something to her "stepchildren in Ghana," Brown claimed that she sent items "monthly." In reality,

6

both S.O. and B.O. were in the United States, living with Brown and Oduro, and had traveled into the United States in 2015 and 2020, respectively, on U.S. passports fraudulently obtained by Brown and Oduro.

### 2.    Count Two: Wire Fraud Conspiracy

Maryland operates the Child Care Scholarship Program ("CCSP"), previously known as the Child Care Subsidy Program, which receives state and federal funding. The program assists qualifying families by paying for childcare expenses during the day if the adult household members work, are in school, or are otherwise in an approved activity that makes it necessary for their children to be in childcare. A parent chooses the childcare provider, which can be a licensed daycare center (a "formal provider") or an unlicensed individual (an "informal provider"). An informal provider may be a grandparent or aunt or uncle, but not a parent, stepparent, or legal guardian. Applicants must agree in writing to this provision and other terms and conditions. If approved, informal providers invoice the State of Maryland. The state government pays them directly, including by direct deposit into a bank account.

Brown signed and submitted applications for the CCSP in May 2016, March 2017, April 2018, March/April 2019, and March 2020. Each time she stated that the children in her care were all her biological children, even though one of those children, S.O., was Oduro's child. On the 2017 and 2018 applications, she reported

7

Oduro as S.O.'s "absent parent," even though Oduro was living in the same household.

Brown designated a "friend" named Ibrahim Osumanu as her informal provider. The real Ibrahim Osumanu was a Ghanaian national who, according to government records, visited the United States between June 2011 and October 2012. He returned to Ghana and has not since re-entered the United States. Oduro pretended to be Osumanu, and sought reimbursement from the State of Maryland for taking care of his and Brown's own children. Oduro, with Brown's assistance, assumed Osumanu's identity by approximately July 2014. Brown and Oduro possessed electronic copies of Osumanu's Permanent Resident card, also known as a green card, and Osumanu's Social Security card as early as April 2014. In July 2014, Brown and Oduro submitted these identification documents to the Pennsylvania Department of Transportation to obtain a Pennsylvania driver's license for Oduro in Osumanu's identity, including Osumanu's name and date of birth. Brown executed a sworn "Affidavit of Residency" that falsely certified that "Ibrahim Osumanu" resided with her. Oduro used the Osumanu identity through at least April 2021. Law enforcement agents who executed a search warrant of Brown's and Oduro's home in Lusby, Maryland in April 2022 recovered financial documents and bankcards in Osumanu's name.

Between at least August 2016 and through at least April 2021, Brown and Oduro fraudulently used Osumanu's identity to receive approximately $78,884.22 in CCSP payments. Brown submitted invoices to the State of Maryland purportedly signed by Osumanu attesting to the childcare services provided. The invoices stated that Osumanu's was the children's "friend." The Comptroller of Maryland made direct deposits to a Capital One bank account ending in -5231 that Oduro controlled. He opened that account in September 2015 using the Pennsylvania driver's license fraudulently obtained in Osumanu's name, and Osumanu's genuine date of birth and social security number. The state transmitted a CCSP payment on April 7, 2021. Bank surveillance video showed Oduro accessing and withdrawing funds from the account on that day. In April 2021, Capital One processed electronic funds transfers using servers in Arkansas.

### 3.    Bankruptcy Offenses (Counts Four and Five)

Oduro used Osumanu's identity to incur debts, including a nearly $18,000 car loan for a GMC sport utility vehicle. On or about March 5, 2018, Brown and Oduro filed a bankruptcy petition under penalty of perjury in Osumanu's name in the United States Bankruptcy Court for the District of Maryland (No. 18-12811), seeking a discharge of consumer debt, such as a car loan and credit card debts, under Chapter 7 of Title 11 of the United States Code. Brown signed a "Bankruptcy Petition Preparer's Notice, Declaration, and Signature" form attesting that she prepared the

bankruptcy documents, including the petition, primary schedules, and a Social Security Number statement requiring disclosure of the debtor's true social security number. Brown completed and submitted the documents under Osumanu's name and using Osumanu's social security number.

In June 2018, Oduro, purporting to be Osumanu, attended a hearing with the bankruptcy trustee. Oduro presented to the trustee a Pennsylvania driver's license in Osumanu's name as identification. Oduro stated during the hearing that he was a childcare contractor with the State of Maryland. The bankruptcy court granted Osumanu a discharge that cancelled the debts incurred in Osumanu's name.

## B.    Evidence Supporting a Necessity Defense

Oduro testified that he left Ghana in 1992 when he was 11 years old. JA526. Beginning at that time, he was a victim of sex trafficking, starting in Niger. JA527. The traffickers took Oduro to various locations in Africa. If he had tried to leave, the traffickers would have killed him. JA528. Eventually he returned home to Ghana, but because he had sex with men, people tried to kill him. He escaped to Senegal, then to Panama, and became a drug courier. JA529-532. When he got to the Mexico-United States border in Tijuana, he turned himself in to Immigration and Customs Enforcement and sought asylum. JA533, JA1371-1376.

After receiving asylum, Oduro traveled to New York to stay with a cousin. JA536-537. But the traffickers followed, demanding money and in exchange

10

providing Oduro with the Osumanu identity. JA537-538. Oduro worked and kept paying the traffickers. JA538-539. He met and married Brown and moved with her to Harrisburg, Pennsylvania. JA539-540. There he continued to pay the traffickers. JA540-541. When Brown instructed him to stop, the traffickers "came to my house, messed my house, leave a message." JA541. Then "they text me and said they did that. They want me to know they know where I live at so I can never hide from them." JA541. In 2015, Brown and Oduro moved to Maryland. Once again, the traffickers followed and Oduro kept paying them. JA542-543.

Oduro had difficulty raising the money to keep paying the traffickers. JA544. He used the funds he got from the State of Maryland to start a business and to repay the traffickers. He testified that "I pay them because if I didn't pay them, Charmaine and the kids and my life are in danger." JA544, JA574. Likewise, he applied for passports for his children in Ghana to protect them:

> ... Those times, in my country, they kill kids from two years, three years to 20 years, they use them as money rituals. They will kill them and take their body parts and dump them on the street. That happened with my cousin's daughter. When my son [S.O.], they are playing together outside my house. There are three of them playing. This lady approach them and asked the older among them is seven years. That time [S.O.] is three years. And the seven years old boy got his little brother, which is two years.

> So, the mom asked them to go outside and play because they were cooking in the house because we live in a compound house in Africa. And they use cold port [sic] and cook. So they don't want them to come near the fire, so they ask them to go out.

So, the lady approached them and asked them -- and asked the seven years old boy, because he can talk. "Hey, your mother wants you. Go into the house. Your mother wants you." So, as soon as the seven years old boy went, [S.O.] behind him. So, as soon as [S.O.] ran behind him in the house, they left the two years old outside by his self. This lady picked the two years old boy, go behind the same -- behind our house — my family house, rip this two-year-old child apart, take body parts and dump the body in the mound hole.

JA544-545.

Oduro then explained:

So, when I see those things — and every month we still having videos, pictures of kids that's coming every single day. Charmaine see how stressed I was, how worried I was. So, I approached Charmaine and said, listen, I cannot let my kids be in this kind of situation. I don't know when you're going to meet my son because this is a close call. When he comes to my house, these people have money, even if they arrest them, they pay their way and get out. So, I told her, I told Charmaine, can you let me use [K.B.]'s information so that I can help [S.O.] to come to this country.

JA545-546.

Consistent with this account, Brown testified that she met Oduro in New York and brought him to her hometown of Harrisburg. JA596. Pressure from the traffickers followed, with threatening phone calls and eventually a home break-in. JA597. One day when Brown came home, she found the following scene:

... the house was in disarray. Everything was taken out of the closets. The TVs were broken. And they actually urinated all over the babies' stuff, because at the time [her twin son and daughter] were still babies, like literally, like really young. They had urinated all over their stuff.

JA597. Uduro "was giving up about 80 percent of his check" to the traffickers.

JA598. She also learned that Oduro's children in Ghana were threatened, and saw

text messages that he received, coupled with a demand for money:

> Okay. So, they said that they would mutilate the little boy or the children, especially [S.O.]. He seemed to be the one they focused in on a lot as a boy. They were mutilating.
>
> At one time it was very disturbing. They sent a video of child pornography of a little boy being sexually assaulted. And I seen that with my only eyes. And told them this would happen to his own son. He knows how it is.

JA607.

When Brown and Oduro moved to Maryland, the traffickers and their

demands followed. JA609-610. During their time living in Germantown, Brown

testified, "[t]he brakes on my Dodge had been cut. I would find dead animals on our

front porch. My mailbox was taken off its stand." JA609.

As a result of these threats, Brown explained that they used K.B.'s identity for

a passport application for S.O. "[b]ecause I thought [S.O.] was going to be killed.

And I was trying to get him to America." JA615. She had no intent to defraud and

was trying to save S.O.'s life. JA618. Similarly, Brown and Oduro applied for funds

from Maryland's CCSP to obtain the funds they needed to pay off the incessant

threats. The money "[w]as sent off to the traffickers.... No, there was no other

choice." JA618. Every time Brown sought assistance from the government regarding

the traffickers, she was unsuccessful. She had called the FBI Hotline, a National

Trafficking Hotline, and the Harrisburg City Police but received nothing more than "tips on how to remain safe" and a promise to forward messages. JA612-613. She also reported information about trafficking to the office of one of Maryland's U.S. Senators, Benjamin Cardin. JA662.

With regard to the bankruptcy filings, Brown testified that her goal was to kill off the Osumanu identity so that the threats would stop. She did not believe she was intentionally committing a crime. JA619-620.

The government offered no evidence to contradict Oduro and Brown's testimony about the threats they received from the traffickers. Based on their testimony, the district court instructed the jury about the defense of necessity with regard to Count One, Two, and Three:

> Now, the defendant has introduced evidence in order to show that she committed the acts charged in the indictment because she was acting out of necessity. If you conclude that the Government has proven beyond a reasonable doubt that the defendant committed one or more of the crimes charged in Counts 1, 2, or 3, then you must consider, for each of these counts which you find to have been proven, whether the defendant's actions were justified by necessity, which would be a defense to the crime. This defense, and this instruction relating to this defense, applies only to Counts1, 2, and 3.

> To find that the defendant's acts were justified by necessity, and therefore, that she is not guilty on that particular -- on the particular count at issue, the defendant must establish the following elements by a preponderance of the evidence:

> First, that she was under an unlawful and present threat of death or serious bodily injury, or is protecting someone from an unlawful and present threat of death or serious bodily injury;

Second, that she did not recklessly place herself in a situation where she would be forced to engage in criminal conduct;

Third, that she had no reasonable legal alternative to both the criminal action and the avoidance of the threatened harm; and

Fourth, there existed a direct causal relationship between the criminal action and the avoidance of the threatened harm.

The defendant has the burden of proving this defense by a preponderance of the evidence. To prove something by a preponderance of the evidence means to prove that it is more likely true than not true. It is determined by considering all of the evidence and deciding which evidence is more convincing. The fact that the defendant has raised this defense does not relieve the Government of the burden of proving all of the elements of the crime beyond a reasonable doubt. You should consider this defense separately for each of Counts 1, 2, and 3.

JA756-757.

## C.    Verdict

At the end of the government's case and again at the end of the defense case, Brown moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a). JA522-24, JA696-698. The district court denied the motions. JA697. On April 24, 2024, the jury found Brown guilty on Counts One, Two, Four and Five and not guilty on Count Three. JA834-835, JA855-856.

## III.    SENTENCING

At a sentencing hearing on July 23, 2024, the district court determined that Brown's offense level was 20, with a criminal history category of II, for an advisory guidelines range of 37-46 months. JA880-881 It sentenced Brown to concurrent

terms on each count of 30 months of imprisonment, to be followed by three years of supervised release. It imposed a special assessment fee of $400 and ordered $128,201.22 in restitution. JA908-09, JA932-938. This timely appeal followed. JA939.

## SUMMARY OF ARGUMENT

All four counts of conviction are defective. As to Counts One and Two, Brown presented compelling evidence that satisfied all of the elements of a necessity defense. Because the evidence stood uncontroverted, the district court erred by not granting Brown's motion for judgment of acquittal on those counts.

Separately, the government failed to prove the wire fraud conspiracy in Count Two because it failed to prove an agreement that involved the close relationship between the alleged fraud scheme and the alleged interstate wire communication required by *United States v. Maze,* 414 U.S. 395 (1974), and related Supreme Court and court of appeals decisions. The government did not prove beyond a reasonable doubt that any connection existed between the wiring of state funds to Oduro's account and his withdrawal of a substantially larger amount from funds that were already available to him regardless of the transfer. With regard to the entire conspiracy, the government did not even prove that the wirings and deposits took place prior to Oduro's withdrawals, as required by controlling precedent.

The bankruptcy charges in Counts Four and Five were also defective. Count Four included a legally invalid theory that the bankruptcy trustee could be the victim of a bankruptcy fraud scheme under 18 U.S.C. § 157. Not so. The submission of that erroneous theory of liability to the jury was not harmless error because the government failed to prove beyond a reasonable doubt the existence of an extrinsic scheme to defraud creditors that Brown executed with the requisite intent to defraud and lack of good faith. For the same reason, the government failed to provide sufficient proof that Brown acted fraudulently and without good faith when she submitted to the bankruptcy court the documents charged in Counts Four and Five. And it failed to prove that the false statements in Count Five were material.

The district court also imposed a substantively unreasonable sentence. Oduro pleaded guilty to Counts One, Three and Four of the indictment: passport fraud conspiracy; aggravated identity theft; and bankruptcy fraud. The statement of facts contained additional facts related to the wire fraud conspiracy and theft of Osumanu's identity. As mandated by 18 U.S.C. § 1028A, the district court imposed a 24-month consecutive sentence on Count Three, but just four months on Counts and Four. Brown was *acquitted* on the § 1028A charge in Count Three, the count that generated 24 months of the 28-month sentence that Oduro received. Yet the district court sentenced her to concurrent sentences of 30 months imprisonment as to Counts One, Two, Four and Five — *seven-and-a-half times* longer than the

17

four-month sentence imposed on Oduro for his counts of conviction that did not require a mandatory minimum sentence. This Court has held that district courts are "prohibited from imposing any sentence that represents an 'unwarranted sentencing disparity.'" *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Brown's sentence violated that command.

## STANDARDS OF REVIEW

**Sufficiency of the evidence:** This Court reviews the sufficiency of the evidence to determine whether, viewing the evidence in the light most favorable to the government, no "rational trier of fact could have found" that all elements of the charged offense were proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The district court must apply this standard to a motion for judgment of acquittal under Fed. R. Crim. P. 29(a). The Court reviews *de novo* the district court's denial of a motion for judgment of acquittal. *United States v. Moody,* 2 F.4th 180, 189 (4th Cir. 2021).

**Plain Error.** This Court reviews issues not raised in the district court for plain error, which requires (1) an error; (2) that is plain; (3) affects a defendant's substantial rights; and (4) affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Hope,* 28 F.4th 487, 508 (4th Cir. 2022).

**Sentencing:** This Court reviews sentences imposed pursuant to 18 U.S.C. § 3553 for substantive reasonableness under an abuse-of-discretion standard. *Gall v.*

*United States*, 552 U.S. 38, 41 (2007). Substantive reasonableness depends on "the totality of the circumstances." *Id.* at 51. It "largely depend[s] upon the specific facts of each case and the district court's consideration and application of the § 3553(a) factors to those facts." *United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006). An appellant may rebut the presumption of reasonableness "by showing that the sentence is unreasonable when measured against the ... § 3553(a) factors." *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014). This Court's substantive reasonableness review may include a sentencing disparity claim. *United States v. Allmendinger*, 706 F.3d 330, 344 (4th Cir. 2013).

## ARGUMENT

I. **BECAUSE THE GOVERNMENT OFFERED NO EVIDENCE TO CONTROVERT BROWN'S NECESSITY DEFENSE, THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN HER CONVICTIONS ON COUNT ONE AND TWO, AND THE DISTRICT COURT ERRED IN DENYING HER MOTION FOR JUDGMENT OF ACQUITTAL**

Oduro and Brown presented harrowing testimony about the years of threats, violence, and extortion that they endured from the human traffickers and drug traffickers from whom Oduro had tried to escape when he entered the United States. The government offered no evidence to refute this testimony, and the district court determined that with regard to Counts One through Three, Brown was entitled to a jury instruction on the affirmative defense of necessity. The district court erred,

however, by not going one step further and, on the undisputed record, granting a motion for judgment of acquittal regarding the necessity defense.

In *United States v. Bailey,* 444 U.S. 394 (1980), the Supreme Court explained the defenses of duress and necessity:

> Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity.

*Id.* at 409-10 (citation omitted). Put another way, a necessity defense may be asserted "by a defendant who was confronted with ... a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts." *United States v. Al-Rekabi,* 454 F.3d 1113, 1121 (10th Cir. 2006).

Brown satisfied the requirements this Court set forth in *United States v. Crittendon,* 883 F.2d 326 (4th Cir.1989), because she presented evidence which would allow the fact finder to conclude that she:

(1) was under unlawful and present threat of death or serious bodily injury;

(2) did not recklessly place [herself] in a situation where [s]he would be forced to engage in criminal conduct;

(3) had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm); and

(4) a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Id.* at 330; *see also United States v. Cassidy,* 616 F.2d 101, 102 (4th Cir. 1979) (per curiam). As the Court recognized in *United States v. Mooney,* 497 F.3d 397 (4th Cir. 2007), Congress's failure to provide specifically for common law defenses in drafting a criminal statute "does not necessarily preclude a defendant charged with violating the statute from relying on [that] defense." *Id.* at 403 (quoting *United States v. Panter,* 688 F.2d 268, 271 (5th Cir.1982)).

Here, the district court should have gone beyond instructing the jury on necessity and granted a motion for judgment of acquittal on Counts One and Two because the defense had been established beyond any doubt. In applying the *Jackson v. Virginia* standard to the jury verdict in this case, this Court must review the evidence in the light most favorable to the government and determine whether any rational trier of fact could have rejected a necessity defense. *See United States v. Quilty,* 741 F.2d 1031, 1032-33 (7th Cir. 1984) (addressing whether district court erred in failing to grant judgment of acquittal on defense of necessity).

Applying that standard, the government failed to present any evidence to contradict the testimony that Brown was under unlawful and present threat of death

or serious bodily injury. The record contains no evidence that Brown recklessly placed herself in a situation where she would be forced to engage in criminal conduct. To the contrary, Brown and Oduro moved from New York to multiple residences in Harrisburg and then to multiple residences in Maryland to try to escape the threats and extortion from the traffickers. When those efforts failed, and when the government — including federal and state law enforcement agencies from whom they sought assistance — did nothing to help them, they had no reasonable legal alternative (to both the criminal act and the avoidance of the threatened harm) other than to seek an American passport to save S.O.'s life and to seek Maryland state funds to enable them to make payments to the traffickers.

On these facts, there was unequivocally a direct causal relationship between the unfortunate but essential — and non-violent — criminal action and the avoidance of the threatened harm. The district court erred in denying Brown's motion for judgment of acquittal as to Counts One and Two.

**II. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN BROWN'S CONVICTION ON COUNT TWO FOR VIOLATING 18 U.S.C. § 1349 WHERE THE GOVERNMENT FAILED TO PROVE AN AGREEMENT THAT COVERED ALL ELEMENTS OF THE WIRE FRAUD STATUTE**

Count Two of the indictment charged Brown with a wire fraud conspiracy. The government's proof at trial failed to prove a critical component of such a

conspiracy: an agreement to use interstate wire communications in a manner that executed a wire fraud scheme.

The indictment alleged that Brown and Oduro violated 18 U.S.C. § 1349 by conspiring to commit wire fraud by devising a scheme to defraud the CCSP and obtain money from the program by means of false and fraudulent pretenses, and to execute the scheme by causing the transmission of interstate wire communications. The district court correctly instructed the jury that it had to find the existence of and knowing and willful membership in a conspiracy, whose object was wire fraud, an offense whose elements are (1) a scheme and artifice to defraud; (2) knowing and willful participation in the scheme; and (3) "that in the execution of that scheme, the defendant used or caused the use of interstate wires as specified in the Indictment." JA741-742. With regard to the third element, the indictment alleged as a manner and means that "**ODURO** and **BROWN** caused the State of Maryland to transmit [CCSP] payments by electronic funds from the Maryland State Treasurer, in Maryland, to Capital One Bank, in Virginia," ¶ 5(f), and as an overt act that on or about April 7, 2021 "the same day the State of Maryland transferred funds into a Capital One bank account in the name of [Osumanu] and controlled by **ODURO** on the basis of a false and fraudulent invoice submitted by **ODURO**, **ODURO** withdrew funds from the account." ¶ 6(d). JA30-31.

The government presented evidence about CCSP from a program official (John Lamb) and a State Department investigator (Special Agent Paul Spakauskas), but neither testified that the program transmitted funds to Virginia. Oduro maintained the Osumanu account at a Capital One branch in Germantown, Maryland and conducted all of his transactions in Maryland. JA1126-1127. With regard to the April 7, 2021 withdrawal in particular, Special Agent Spakauskas testified about a Capital One bank record that showed that a deposit of $386 and a withdrawal of $2,000 on April 7, 2021. JA499-501, JA333. He associated the $386 deposit with an invoice for $386 dated April 1, 2021. JA499-501, JA1129. He stated that the April 1 date on the state record "is when the Maryland comptroller effectively released the funds. It still had to land in this bank, in the bank account. So, there's a pending period for about six or seven days." JA500. When the prosecutor asked "where Capital One bank processes these electronic fund transfers in the month of April 2021," the witness answered: "Arkansas." JA500. The witness did not testify, and the exhibits did not specify, whether eventual transfer of a $386 payment into the Osumanu account occurred before or after Oduro withdrew $2,000 on April 7, 2021. The bank record showed that even without the $386 deposit, the Osumanu Capital One account had a balance of $2,095.72 prior to the April 7, 2021 transactions.

On this record, the government also failed to prove an agreement to commit all of the elements of wire fraud. Specifically, the evidence was defective regarding

24

the third element — that a wire communication executed the scheme to defraud the CCSP. To execute or attempt to execute a scheme to defraud, a wire communication must be "incident to an essential part of the scheme" or "a step in [the] plot." *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (citations omitted). In Brown's case, the government failed to prove that the only specific interstate wire communication charged in the indictment, between the State of Maryland and a Capital One processor in Arkansas (not Virginia), occurred during, rather than after, the fraudulent acquisition of funds that was the objective of the charged conspiracy. And it likewise failed to prove that any other wire communications between the State of Maryland and Capital One during the conspiracy occurred before Oduro and Brown acquired CCSP funds related to the communications.

In its decisions interpreting the mail and wire fraud statutes,[1] the Supreme Court has long required a close relationship between fraud schemes and the mailings or wire communications used to execute them. In *United States v. Maze,* 414 U.S. 395 (1974), the defendant was convicted of mail fraud under 18 U.S.C. § 1341 based on his unauthorized use of his roommate Meredith's car and bank card, which he took on a cross-country trip to California. Claiming to be Meredith, Maze used the bank card to obtain lodging and food. After reviewing earlier cases where mailings

---

[1] The Court has "construed identical language in the wire and mail fraud statutes *in pari materia*." *Ciminelli v. United States,* 598 U.S. 306, 312 n.2 (2023) (quoting *Pasquantino v. United States*, 544 U.S. 349, 355, n. 2 (2005)).

were deemed not to have executed the charged fraud scheme, *Kann v. United States*, 323 U.S. 88 (1944); *Parr v. United States*, 363 U.S. 370 (1960), the Court reversed Maze's convictions because the mailings he caused to occur did not play a significant part in the execution of a fraud scheme whose success did not depend on the eventual mailings between the merchants, a bank, and Meredith. Rather, Maze's scheme had "reached fruition when he checked out of the motel." 414 U.S. at 402. "Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be 'for the purpose of executing such scheme or artifice ....'" *Id.* at 405. Because the mailings at issue did not do so, the Court reversed Maze's mail fraud convictions.

Underscoring this holding, *Schmuck v. United States*, 489 U.S. 705 (1989), explained that the mail fraud statute was not designed "to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Id.* at 710 (quoting *Kann,* 323 U.S. at 95). "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck,* 489 U.S. at 715.

Courts of appeals frequently have applied this standard to void mail or wire fraud convictions where the government presented an insufficient connection between the mailing or wiring and the fraud scheme. In *United States v. Phillips*, 704 F.3d 754 (9th Cir. 2012), a corporate executive devised a scheme to fraudulently obtain funds from his employer and then, through a series of convoluted transactions, used those funds to purchase two $30,000 watches, which were mailed to him. The Ninth Circuit reversed the mail fraud conviction, stating:

> Here, as in *Maze*, the success of Phillips's fraudulent scheme did not depend in any way on the use of the mails. The fact that Phillips purchased a watch with $30,000 of fraudulently obtained MOD funds, instead of using the funds for his personal benefit in some other fashion, did not in any way affect the scheme "to defraud MOD and to obtain money from MOD," as charged in Count 5. The fact that payment eventually was made to a watch dealer and that watch dealer mailed a watch in return was not a *part of the scheme to defraud* MOD and to obtain money from MOD — it was simply the byproduct of that scheme. Put another way, as a result of Phillips's successful execution of his scheme to defraud, he had sufficient funds to pay for the watch.

704 F.3d at 763.

In *United States v. Hartsel*, 199 F.3d 812 (6th Cir. 1999), an attorney who used funds contributed to the charity for personal use or to pay his law firm's debts was charged with wire fraud based on mailings of bank statements for the charity's account. The Sixth Circuit held that while the bank account was an essential part of the defendant's scheme and that the mailing of the bank statements was incident to the maintenance of that account, "sufficient evidence to show that the bank

27

statements were used in some way to aid or further the scheme before the mailing requirement [was] satisfied." 199 F.3d at 818. In Hartsel's case, the government failed "to establish that the bank statements themselves served any useful step, purpose, or role in furthering the scheme." *Id.* The court noted the absence of evidence that Hartsel needed the bank statements to obtain funds from the charity's account, leading to the conclusion that "the evidence could not persuade any rational fact-finder beyond a reasonable doubt that Hartsel actually used the bank statements in furtherance of or as a step in his scheme to defraud the [charity]." *Id. See also United States v. Frost*, 125 F.3d 346, 358 (6th Cir. 1997) (mailing of vouchers had no relationship to the fraudulent scheme).

In *United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016), the essence of the fraud scheme was that defendants would hire candidates for positions at a government agency based on legislative recommendations, not merit, and would lie on forms certifying the hires were done correctly. *See id.* at 50-51. They did so to receive increased funding and legislative favors for the agency. *Id.* The mail fraud charges rested on the mailing of rejection letters to unsuccessful applicants. *Id.* at 59. The First Circuit held that a charged "mailing — even if dispensable — must at least have some tendency to facilitate execution of the fraud." *Id.* Reversing mail fraud convictions, it held that the government failed to prove that mailing "the rejection letters served [the] duplicitous function" of "maintain[ing] the façade of a merit-

28

based system." *Id.* Cases cited by the government "do not require us to find that these rejection letters were sent 'in furtherance of' the defendants' scheme." *Id.* at 61.

Applying those precedents to Brown's case, the government did not prove beyond a reasonable doubt that the charged wire transfer (to a state other than the one referenced in the indictment) that made $386 available to Oduro occurred before or after he withdrew $2,000 in cash from Capital One. And it did not prove that the $386 had anything to do with the $2,000 withdrawal. Based on the evidence presented to the jury, it was just as likely that the wire communication that resulted in the deposit of $386 into the Osumanu account took place *after* Oduro had received the funds and left the bank branch. Indeed, for the entire conspiracy charge, the jury could only speculate that *any* wire communications took place prior to the withdrawal of funds CCSP funds from Capital One. Consequently, the Count Two wire fraud conspiracy charge falls squarely within the terrain of *Maze, Phillips, Hartsel* and *Tavares,* where the government failed to establish that the mailings or wirings themselves served any useful step, purpose, or role in furthering the scheme to defraud. Finally, the evidence in this case does not permit application of the limited exception to *Maze* under which mailings or wirings "occurring after receipt of the goods obtained by fraud are within the statute if they were 'designed to lull the victims into a false sense of security, postpone their ultimate complaint to the

29

authorities, and therefore make the apprehension of the defendants less likely than if no mailings [or wirings] had taken place.'" *United States v. Lane,* 474 U.S. 438, 451–52 (1986) (quoting *Maze,* 414 U.S. at 403).

On these grounds, Brown's conviction on Count Two should be reversed.

### III.    COUNT FOUR SHOULD BE REVERSED BECAUSE THE INDICTMENT INCORRECTLY CHARGED THAT A TRUSTEE COULD BE THE VICTIM OF A VIOLATION OF 18 U.S.C. § 157 AND THE JURY INSTRUCTIONS PERMITTED A GENERAL VERDICT THAT INCLUDED THIS INVALID THEORY

Count Four alleged that on one single day (March 5, 2018), Oduro and Brown "knowingly and willfully devised and intended to devise a scheme and artifice to defraud creditors and the bankruptcy trustee…" It alleged that the scheme involved using Osumanu's identity to make purchases (which took place prior to March 5, 2018), preparing and filing a bankruptcy petition in Osumanu's name, and having Oduro appear as Osumanu at a discharge hearing on June 21, 2018 (six weeks after the "scheme" ended on March 5, 2018), which led to the entry of a discharge order. Brown's conviction on Count Four should be reversed because that allegation, and the jury instructions, included an invalid theory of guilt. Because this issue has been raised for the first time on appeal, this Court reviews for plain error — and should find that all elements of the plain error test have been satisfied.

The district court instructed the jury that the charge in Count Four involved "a scheme to defraud creditors and the bankruptcy trustee," JA745, and then

30

instructed the jury that it could convict if it found that the defendant filed a petition

for bankruptcy and knowing and willfully participated in "a scheme or artifice to

defraud as alleged in the indictment...." JA746. But the "scheme or artifice to

defraud as alleged in the indictment" was defective, because the bankruptcy trustee

could not as matter of law have been the victim of a scheme to defraud. Bankruptcy

fraud under 18 U.S.C. § 157 "requires a specific intent to defraud an identifiable

victim or class of victims of the identified fraudulent scheme." *United States v.*

*Milwitt,* 473 F.3d 1150, 1156 (9th Cir. 2007); *see also United States v. Spurlin,* 664

F.3d 954, 964 (5th Cir. 2011); *United States v. Skinner,* 2023 WL 2770952, at *1

(4th Cir. Apr. 4, 2023) (citing *United States v. Yurek,* 925 F.3d 423, 439 (10th Cir.

2019)).

A violation of § 157

> cannot be predicated only on acts that occur within the bankruptcy
> context that are untethered to the underlying fraudulent scheme. Other
> provisions of the bankruptcy criminal statutes address those acts,
> including § 152. However, bankruptcy fraud under § 157 must be
> related to the alleged fraudulent scheme.

*Milwitt,* 475 F.3d at 1160. That is, the filing of the petition must seek to further a

"scheme [that] qualifies as 'outside' the bankruptcy for purposes of the

statute." *United States v. Quan,* 358 F. App'x 854, 856 (9th Cir. 2009), or a

"fraudulent scheme separate from the bankruptcy proceedings." *United States v.*

*Yagman,* 345 F. App'x 312, 313 (9th Cir. 2009). Accordingly, a "scheme and artifice

to defraud ... the bankruptcy trustee" cannot and does not fall within § 157.

31

The jury returned a general verdict on Count Four. A general verdict of guilty "does not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all of them." *United States v. Stanley*, 597 F.2d 866, 872 (4th Cir. 1979) (citation omitted). The Supreme Court has made clear that "[a] conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (citing *Stromberg v. California*, 283 U.S. 359 (1931); *Yates v. United States*, 354 U.S. 298 (1957)); *see also Griffin v. United States*, 502 U.S. 46 (1991). The rule of *Yates* and *Stromberg* — that "a verdict [must] be set aside in cases where the [it] is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected," *Yates*, 354 U.S. at 312 — applies to precisely the kind of legal error presented in this case. *See Griffin*, 502 U.S. at 58-59. Since the jury was instructed on alternative theories of liability, one of which was statutorily invalid, the error was not harmless. The jury could not permissibly convict Brown of scheming to defraud the trustee, and for the reasons set forth in Section IV, the government failed to prove an extrinsic scheme to defraud creditors that Oduro's bankruptcy filing executed.

As noted above, Brown's challenge to Count Four on this basis is reviewed for plain error, which requires (1) an error; (2) that is plain; (3) affects a defendant's substantial rights; and (4) affects the fairness, integrity, or public reputation of

32

judicial proceedings. *United States v. Hope*, 28 F.4th 487, 507 (4th Cir. 2022). A conviction that rests upon a general verdict that includes an invalid legal theory satisfies all of these elements. In recent years, this Court has not hesitated to find plain error when defendants were convicted on invalid grounds under 18 U.S.C. § 922(g) for conduct that *Rehaif v. United States*, 588 U.S. 225 (2019), later held to be outside the reach of the statute. *See United States v. Banks*, 104 F.4th 496, 514-16 (4th Cir.), *cert. denied*, ___ S. Ct. ___, 2024 WL 4427486 (2024); *United States v. Barronette*, 46 F.4th 177, 198-201 (4th Cir.), *cert. denied*, 143 S. Ct. 414 (2022).

For this reason alone, Brown's conviction on Count Four should be reversed.

### IV. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN BROWN'S CONVICTIONS ON COUNTS FOUR AND FIVE BECAUSE THE GOVERNMENT FAILED TO PROVE BEYOND A REASONABLE DOUBT HER SPECIFIC INTENT TO DEFRAUD CREDITORS AND LACK OF GOOD FAITH

With regard to the other potential theory of liability on Count Four — a scheme and artifice to defraud creditors — and the bankruptcy false statement charge in Count Five, the government's evidence fell short of proving Brown's guilt beyond a reasonable doubt because it failed to prove a specific intent to defraud such victims and absence of good faith.

As to Counts Four and Five, the government and defense each presented one witness regarding the allegations of bankruptcy fraud and false statement in bankruptcy. The government called an Assistant United States Trustee to testify

specifically about the bankruptcy offenses in Counts Four and Five. There was no dispute that Oduro used Osumanu's identity to incur debts and then filed a bankruptcy petition under penalty of perjury in Osumanu's name in the United States Bankruptcy Court for the District of Maryland (No. 18-12811), seeking a discharge of consumer debt, such as a car loan and credit card debts under Chapter 7 of Title 11 of the United States Code.

Testifying in her defense, Brown did not dispute that she signed a "Bankruptcy Petition Preparer's Notice, Declaration, and Signature" form attesting that she prepared the bankruptcy documents, including the petition and its primary schedules, as well as a Social Security Number statement requiring disclosure of the debtor's true social security number, and that the documents contained Osumanu's name and using Osumanu's social security number. She made testified that she did so in an attempt to get rid of the Osumanu identity, which was well known to the traffickers, and that she did so without any intent to defraud.

On this record, the government failed to prove the permissible prong of Count Four or the charge in Count Five. The government did not call as witnesses any representatives of creditors listed in the bankruptcy schedules. It offered no proof, direct or circumstantial, establishing a preexisting scheme and artifice to defraud any car dealer, student lender, credit card issuer, or other creditor that the bankruptcy filing executed. It offered no evidence to establish Brown's specific intent to defraud

when she assisted Oduro with his bankruptcy. Indeed, the only mention of Brown in the Assistant U.S. Trustee's testimony was that Brown prepared the bankruptcy petition, JA245-246, and previously had filed for bankruptcy. JA252-258. The government offered no evidence to contradict Brown's testimony that her only goal was to kill off the Osumanu identity so that the threats from traffickers would stop. JA620-621.

As part and parcel of the requirement that the government prove intent to defraud, the district court instructed the jury that "[s]ince an essential element of the crime charged is intent to defraud, it follows that good faith on the part of the defendant is a complete defense to a charge of bankruptcy fraud," JA749-750, and that "[t]he burden is on the Government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt." JA750. The government presented no evidence that Brown's efforts to use the bankruptcy process to kill of the Osumanu identity, even if misguided and foolhardy, were done with any kind of bad faith towards Oduro's creditors.

Under these circumstances, the government failed to prove beyond a reasonable doubt Brown's specific intent to defraud creditors, failed to prove her lack of good faith, and failed to prove its case as to Count Four.

The offense charged in Count Five, 18 U.S.C. § 152(3), provides that whoever "knowingly and fraudulently" makes a false declaration, certificate,

verification, or sworn statement in or in relation to a bankruptcy case commits a crime. Conviction of the offense requires proof that a defendant acted knowingly and fraudulently. *United States v. Hughes,* 401 F.3d 540, 545 (4th Cir. 2005); *United States v. Nabaya,* 765 F. App'x 895, 901 (4th Cir. 2019). Brown acknowledged that she knowingly prepared Oduro's bankruptcy papers. But for the reasons stated above, the government did not present evidence that she acted with any purpose other than the intent to eliminate the Osumanu identity, and certainly not with intent to defraud any creditor, trustee, or bankruptcy judge or with bad faith.

For these reasons, Brown's convictions on Counts Four and Five should also be reversed.

## V.  THE GOVERNMENT FAILED TO PROVE THE MATERIALITY OF THE ALLEGED FACTS STATEMENTS IN COUNT FIVE

On Count Five, the district court instructed the jury that in addition to intent to defraud, it could only find a violation of 18 U.S.C. § 152(3) based on proof beyond a reasonable doubt that the Osumanu bankruptcy petition was false, made under penalty of perjury, and related to a material fact. JA752. On the materiality issue, it stated that

A material fact is one which relates to the extent and nature of the debtor's assets, or the business or financial transactions of the debtor, or to the discovery of assets, or to statements designed to secure an adjudication of bankruptcy. A material fact refers not only to the main fact which was the subject of the inquiry, but to any fact or

36

circumstance which tends to corroborate or strengthen the proof
introduced to establish the main fact.

JA752-753. Materiality is an element of 18 U.S.C. § 152(3). *See United States v.
Gellene*, 182 F.3d 578, 587 (7th Cir. 1999); *United States v. Yagow*, 953 F.2d 427,
432 n. 2 (8th Cir.1992); *United States v. Naegele*, 367 B.R. 1, 10 (D.D.C. 2007).

Count Five alleged a single fact: that defendants filed a bankruptcy petition
"using the name and partial social security number of [Osumanu], when in fact that
petition was not filed by [Osumanu]. JA35. Why were those alleged falsehoods
material? The government never addressed the question at any stage of the case. The
government's sole witness regarding the Osumanu bankruptcy, Assistant U.S.
Trustee Jeanette Rice, did not explain why the statements in the petition were
material. JA221-223. In the government's initial closing argument, Assistant U.S.
Attorney Ruiz simply walked through the elements of the bankruptcy offenses and
cited the uncontroverted but non-germane fact that the Assistant U.S. Trustee had
testified that Brown and Oduro had filed the Osumanu bankruptcy action.
JA779-780. In her rebuttal argument, Assistant U.S. Attorney Mao did not mention
materiality at all. JA801-808. The government's failure to address an element of the
offense as to which it bore the burden of establishing proof beyond a reasonable
doubt should be treated as a confession that no such proof existed.

Because the government failed to prove intent and materiality, Brown's
conviction on Count Five should be reversed.

## VI.  BROWN'S SENTENCE WAS SUBSTANTIVELY UNREASONABLE

On December 14, 2023, Oduro pleaded guilty to Counts One, Three and Four of the indictment: passport fraud conspiracy; aggravated identity theft; and bankruptcy fraud. The statement of facts contained additional facts related to the wire fraud conspiracy and theft of Osumanu's identity. JA49-50. At his sentencing hearing on March 29, 2024, the district court determined that as to Counts One and Four, the advisory guidelines range was 8 to 14 months imprisonment, with a mandatory 24-month consecutive sentence on Count Three. JA55.

Title 18 U.S.C. § 1028A mandates that in determining the sentence to be imposed for the predicate offense, "a court shall not in any way reduce the term to be imposed for such crime [Aggravated Identity Theft] so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section." 18 U.S.C. § 1028A(b)(3). Nevertheless, on Counts One and Four the district court varied downwards to a four-month sentence on the predicate offenses (50 percent of the low end of the guidelines range) because "the combination of these counts is well addressed by the mandatory minimum sentence that is here." JA87. It found that these offenses "don't necessarily generate an automatic prison term," JA88, and, combined with the 24-month mandatory sentence under § 1028A, imposed a total sentence of imprisonment of 28 months. The government then dismissed Counts Two and Five.

Brown was *acquitted* on Count Three, the count that generated 24 months of the 28-month sentence that Oduro received. At her sentencing hearing, the district court determined he offense level to be 20, with a criminal history category of II, for an advisory guidelines range of 37-46 months. JA880-881. The court imposed concurrent sentences of 30 months imprisonment as to Counts One, Two, Four and Five. JA908-909, JA932-938. In other words, as to the counts of conviction that did not involve a mandatory minimum sentence under 18 U.S.C. § 1028A, the district court imposed a sentence that was *seven-and-a-half times* longer than the four-month sentence imposed on Oduro for that conduct. It was also more than 80 percent of the low end of the guidelines range (30 months vs. 37 months), as opposed to just 50 percent of the low end (four months vs. eight months) in Oduro's case.

Substantive reasonableness depends on "the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 51 (2007). An appellant may rebut the presumption of reasonableness "by showing that the sentence is unreasonable when measured against the ... § 3553(a) factors," *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014), including by demonstrating disparate sentencing. *United States v. Allmendinger*, 706 F.3d 330, 344 (4th Cir. 2013).

Brown satisfied this standard because the disparity between the district court's disparate sentences on the counts that did not carry a mandatory minimum under 18 U.S.C. § 1028A was contrary to what Congress intent regarding the aggravated

39

identity fraud statute. When Congress enacted § 1028A in 2004, its goal was to enhance criminal penalties for identity theft. Congress was especially concerned concern about identity theft in the commission of *predicate felonies*. In testimony before the House Judiciary Committee, the counsel to the Assistant Attorney General for the Criminal Division explained:

> [I]dentity theft ... is an entirely derivative offense, in that it is virtually always committed in connection with some other crime. The Sentencing Guidelines, however, are generally designed and intended to be ... charge-neutral: ... in other words, the sentence depends on the underlying ... relevant conduct ... and not on the particular offense charged in the indictment. Thus, the Guidelines will generally ignore the fact that two offenses have been charged (a derivative offense and a predicate offense); the same sentence would be imposed in such a case as would be imposed even if only the predicate offense had been charged. Consequently, application of the Guidelines would mean that there would be virtually no practical advantage to charging the derivative criminal offense. Prosecutors would have to charge more facts, and prove more facts, without obtaining any additional punishment. [The provision later codified at § 1028A] avoids this problem through the structure of its penalty scheme ... Accordingly, [the bill] provides that, if a person commits aggravated identity theft by stealing someone's identity *in order to commit a serious federal predicate offense,* that person will be sentenced to an additional two years imprisonment over and above the sentence for the underlying offense.

*See* Identity Theft Investigation and Penalties: Hearing on H.R. 1731 Before the H. Subcomm. on Crime, Terrorism, and Homeland Security, 108th Cong. at *4–5 (statement of Timothy Coleman, Counsel to the Assistant Attorney General) (emphasis added). In other words, by making the sentences truly cumulative, the

40

statutory language sought to ensure that prosecutors had an incentive to charge both the aggravated identity theft violation and the predicate offenses.

The district court's disparate sentences on the underlying predicate offenses turns this incentive on its head by punishing Brown and Oduro differently for virtually the same conduct that fell outside the scope of § 1028A and by stripping Brown of any benefits for her acquittal on the § 1028A charge in Count Three.

This Court has held that the sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). District courts are "prohibited from imposing any sentence that represents an 'unwarranted sentencing disparity.'" *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). "[C]ourts have discretion, in appropriate cases, to align co-defendants' sentences somewhat in order to reflect comparable degrees of culpability — at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system." *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008). At Oduro's sentencing, the government acknowledged that the roles of the two defendants were approximately equivalent. JA79-81. To justify the vastly different sentences imposed on Oduro and Brown on the counts other than Count Three, the district court was required to "provide an individualized assessment based on the facts

41

before the court." *United States v. Claybrooks*, 90 F.4th 248, 257 (4th Cir. 2024) (internal quotation marks omitted)). It failed to do so.

Taking into account "the totality of the circumstances to determine whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)," *United States v. Nance*, 957 F.3d 204, 212 (4th Cir. 2020), this Court should find an abuse of discretion, vacate Brown's sentence, and remand for a resentencing on the counts of conviction that imposes a sentence that is not grossly disparate with Oduro's sentence for Counts One and Four.

## CONCLUSION

This Court should reverse Brown's convictions on Counts One, Two, Four, and Five. If it affirms any of these counts of conviction, the Court should vacate her sentence and remand for full resentencing hearing.

Respectfully submitted,

/s/ Stuart A. Berman
Stuart A. Berman
Lerch, Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
saberman@lercheartly.com
(301) 657-0729
*Attorney for Charmaine Meisha Brown*

Dated: October 30, 2024

42

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _24-4394_    Caption: _US v. BROWN_ _____

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___10,522___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 _____ [*identify word processing program*] in 14 point Times New Roman _____ [*identify font size and type style*]; or

[ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Stuart A. Berman _____

Party Name appellant _____

Dated: 10/30/2024 _____

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

205-989-748

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Andrews Oduro Brown | Jeffrey Searls in his official capacity as Officer-in-Charge of the Buffalo Federal Detention Facility |

**(b)** County of Residence of First Listed Plaintiff  **Genesee County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **Genesee County**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Pro Se

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☒ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity):**
28 U.S.C. § 2241
Brief description of cause:
Ongoing detention violates due process

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

[ Print ]  [ Save As... ]  [ Export as FDF ]  [ Retrieve FDF File ]  [ Reset ]

Docket #
25-cv-6272

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

Andrews Oduro Brown

          Petitioner,

      v.

*Pam Bondi*, Attorney General

          Respondents.

_____

       PETITION FOR WRIT OF
       HABEAS CORPUS PURSUANT
       TO 28 U.S.C. §2241

        Civ. No.:

# CIVIL COVER SHEET

Andrew oduro Brown.
A# 205-989-748.
Buffalo Federal Detention facility
4250 Federal Drive.
Batavia NY 14020.



Buffalo Federal Detention Facility



USDC-WDNY
JUN 1 2 2025
ROCHESTER

Kenneth B. Keating
Federal Building.
100 state street, ROOM 2120.
Rochester NY 14614.
phone # 585-613-4000.
Fax # 585-613-4035.